In re Frank MERONK, Jr. and Evelyn J. Meronk, Debtors.

Frank Meronk, Jr. and Evelyn J. Meronk, Appellants,

v.

Arter & Hadden, LLP, Appellee.

BAP No. CC–99–1628–KDB.

Bankruptcy No. ND–96–14851RR.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Feb. 23, 2000.

Filed April 25, 2000.

Thomas M. Hinshaw, Michaelson, Susi & Michaelson, Santa Barbara, CA, for Frank Meronk, Jr. and Evelyn Meronk.

Michael S. Kogan, Trustee, Arter & Hadden, Los Angeles, CA, pro se Appellee.

Before: KLEIN, DUNN,[1] and BRANDT, Bankruptcy Judges.

## OPINION

KLEIN, Bankruptcy Judge.

This is a tale of individuals who were bankrupted by construction litigation involving a home that turned from dream to nightmare. The debtors, after the trustee settled the lawsuit for enough to pay all creditors in full but not enough to salvage one-third of their own losses, appeal from yet another blow: taking $50,000 from their recoupment to pay trustee's counsel a bonus in addition to counsel's full hourly rates.

This is also a tale of a law firm that refused to be employed on a contingent fee and crowed about the economic efficiency of results it achieved on an hourly basis, only to turn around and request a bonus that eclipsed the difference between hourly fees and the contingent fee it had rejected.

We conclude that the law firm did not prove that it shortchanged itself by charging its standard hourly fees. We further conclude that it was judicially estopped from seeking a bonus. We REVERSE.

### Jurisdiction

The bankruptcy court had subject matter jurisdiction under 28 U.S.C. § 1334. Awards of professional fees are core proceedings concerning administration of the estate. 28 U.S.C. § 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

### Facts

The debtors, Frank and Evelyn Meronk, had a contractor build their dream home in California's Ojai Valley for $2,200,000, financed half by loan and half from savings.

The dream became a nightmare when defective construction made the house uninhabitable—eventually a total loss.

The nightmare migrated to court when they sued the general contractor, who impleaded subcontractors, sweeping the debtors into complex litigation with about fifteen defendants actively litigating through insurance defense counsel.

More than a year later, the debtors fired their lawyer (a decision ratified by the trustee's successful malpractice objection to that firm's claim) and shifted to a construction specialist who agreed to a hybrid hourly-contingent fee.

Nevertheless, cash flow difficulties created by the demands of the litigation soon forced the debtors into a chapter 7 bankruptcy. They had spent $240,000 in litigation expenses, had exhausted their life savings, and had no trial date in sight.

The debtors expected that their recently-retained counsel (with whom they were satisfied) would continue to prosecute the construction litigation; so did he. They also expected that the eventual recovery would pay all creditors and expenses of administration, leaving them with a substantial surplus.

---

1. Hon. Randall L. Dunn, Bankruptcy Judge for the District of Oregon, sitting by designation.

The trustee, a member of the law firm of Arter & Hadden ("the law firm"), rejected the existing counsel as "unacceptable" and hired his own partners as special counsel after another firm, which had initially agreed to a contingency, declined the case.[2]

The debtors asked that the law firm be paid "25% for an out of court settlement or 30% for an in court settlement or an out of court settlement that exceeds $1,500,000."[3]

The law firm rejected the contingent fee proposal in favor of hourly compensation, which the court thereupon approved.[4]

About three months after beginning work, the law firm obtained a mediated settlement in state court for $700,000.

In the memorandum supporting the ensuing motion to have the bankruptcy court approve the settlement as "fair and equitable," the law firm stated three times that the debtors would receive a surplus of "approximately $400,000." Additionally, the trustee (a member of the firm) reiterated the point, saying that the debtors "will receive a surplus of approximately $400,000 from the proceeds paid under the settlement agreement."

The trustee averred that the settlement was more favorable because the hourly fees were less than a contingent fee.[5]

The law firm also drafted a declaration for the debtors to sign in support of the compromise, which has language that similarly touted the savings achieved by the hourly fees.[6]

The precise difference between the hourly fees ultimately charged for the liti-

2. The debtors and their counsel said the other firm declined the case as better left in the hands of existing counsel. The trustee asserted the other firm bowed out because the case was "compromised." No finding was made.

3. The trustee introduced the debtors' March 3, 1997, letter in evidence. It indicates that they continued to expect to recover substantially more than $500,000 and that two years of pretrial skirmishing had taken an emotional toll on them:

> 4. We would like to be informed as to the "magic number" that would be given the OK at mediation. This is critical information for us personally. As you surely understand, our involvement in the lawsuit will take a heavy emotional toll. We are trying to go on with our lives. It's not that we do not need money. However, we do have to consider how much further damage to our personal lives are we willing to go through.
> 5. If the "magic number" is the relatively easy $400,000 to $500,000 our turncoat expert evidently agreed to at mediation, we respectfully consider this a travesty of justice and request that we have no further involvement. This settlement scene brings images of vultures at a carcass. As a matter of self-respect we would like to melt out of the picture. You need no further paperwork or input from us to obtain this settlement. All you need is a competent cost estimate. I have already spent hundreds of hours organizing information to enable you to come up with an honest estimate of what it might cost.

4. The law firm's March 18, 1997, letter declining a contingent fee also responded to the debtors' expression of frustration with a not-very-subtle threat:

> Pursuant to 11 U.S.C. § 521 the Debtor in a bankruptcy proceeding has a duty to cooperate with the Trustee as necessary to enable the Trustee to perform the Trustee's duties under title 11 of the United States Code. The Debtors' failure to cooperate with the Trustee pursuant to 11 U.S.C. § 521 could result in the revocation of the Debtors' discharge pursuant to 11 U.S.C. § 727.
> The Trustee is confident that you will continue to be an active and helpful participant in the Litigation.

5. He said: "Based upon normal contingency fee agreements, Arter & Hadden's [hourly] fees in this case will result in a considerably lower cost to the Debtors' estate than if I had successfully retained counsel on a contingency fee basis."

6. These words were put in the debtors' mouths: "In addition, the attorneys' fees incurred by Arter & Hadden, on behalf of the Trustee in the State Court Action, are significantly lower as a result of its retention on an hourly basis, rather than on a contingency fee basis. Had the Trustee successfully retained counsel on a contingency fee basis, the attorneys' fees in this matter would have been much higher than they are."

gation and the contingent fee that the debtors had originally proposed was $48,940.

The bankruptcy court approved the compromise in a context in which there was no whiff of a bonus. If there had been such a suggestion, the law firm knew the debtors would have objected.[7]

The bankruptcy court awarded the law firm its full hourly rates for services as special counsel for the litigation: fees of $126,060 (in installments of $107,292.50 and $18,807.50) and expenses of $11,331.35. The debtors did not oppose the hourly compensation requests. No fees or expenses were denied.[8]

The law firm waited fourteen months after the settlement before seeking a bonus for its services as special counsel. It argued that there was a good result and that a contingent fee would have been higher. The $50,000 bonus raised the total fee to $176,060, which is more than the $175,000 contemplated by the debtors' proposed contingent fee.

The debtors reasoned that the law firm should not be allowed to renege on its rejection of a contingent fee and that it judicially estopped itself from seeking a bonus by its conduct and representations in obtaining approval of the settlement.

The bankruptcy court reasoned that, although a "fine" result, there was not "evidence that this was a stupendous, wonderful" result. Nevertheless, it awarded the bonus on the premise that it produced a total special counsel fee award of $176,060, which approximated the $175,000 that would have been awarded under the "25 percent contingency agreement that the Meronks wanted to engage them at to begin with."

The bonus award reduced the distribution to the debtors from about $400,000 to $350,000.

## Issues

I. Whether the stringent standard for justifying a bonus fee is diminished when there is a "surplus" chapter 7 estate.

II. Whether judicial estoppel can be applied to preclude a bonus fee to counsel who take an earlier incompatible position.

## Standard of Review

A bankruptcy court's fee award will not be disturbed absent an abuse of discretion or erroneous application of law. *Halperin v. Occidental Fin. Group, Inc. (In re Occidental Fin. Group, Inc.)*, 40 F.3d 1059, 1062 (9th Cir.1994). Judicial estoppel, or preclusion of inconsistent positions, is a discretionary equitable doctrine that is reviewed for abuse of discretion. *United States v. Baird–Neece Packing Corp.*, 151 F.3d 1139, 1147 (9th Cir.1998), *cert. denied*, 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999).

## Discussion

We review the bonus on its merits, then turn to the equitable issue.

### I

The first question relates to the standards for awarding a bonus fee in addition to compensation at one's full hourly rate.

---

7. The debtors, in the October 9, 1997, FAX regarding the declaration that the law firm had drafted for their signature, showed that the bottom line mattered: "we need to know who our 'allowed' creditors are, as we have previously filed vigorous objections to a number of incorrect and, in one case, fraudulent claims." Moreover, they insisted the characterization of a settlement that would net them only $400,000 be changed from "very good" to "acceptable" in light of the fact they lost their home and about $1.3 million in equity and legal fees.

8. The law firm also was awarded its full hourly rates for services as general counsel to the trustee: fees of $34,510 ($19,022 in 12/97; $15,488 in 9/99) and expenses of $4,204.98. The debtors did not oppose this compensation. The firm confirmed at oral argument of the appeal that it did not, and does not, seek a bonus for this work.

## A

The Ninth Circuit standard for adding a bonus to counsel's full hourly rate requires powerful evidence and detailed findings. *Burgess v. Klenske (In re Manoa Fin. Co.)*, 853 F.2d 687, 692 (9th Cir.1988) ("*Manoa Finance* ").

### 1

■ There is a "strong presumption" that payment of one's standard hourly rates constitutes "reasonable compensation." *Manoa Finance*, 853 F.2d at 692.

■ Overcoming the presumption requires two categories of "specific evidence." First, the fee applicant "must come forward with specific evidence showing why the results obtained were not reflected in either his standard hourly rate or the number of hours allowed." *Id.* In addition, the applicant "must also show that the bonus is necessary to make the award commensurate with compensation for comparable nonbankruptcy services." *Id.*

■ Bankruptcy courts are admonished to evaluate such evidence bearing in mind that counsel who contracts at a standard hourly rate is obliged to perform to the best of counsel's ability and to produce the best possible results commensurate with counsel's skill and the client's interests. Thus, when an award is made for all hours charged and at counsel's full hourly rate, there is "very little room for enhancing the award based on his post-engagement performance." *Id., quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

■ If the bankruptcy court does determine that a bonus is appropriate, then it must make detailed findings in support of that determination. *Id.*

### 2

The *Manoa Finance* test retains vitality despite the 1994 revision of § 330(a) imposing a five-factor test for fees:

In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under the title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

The controlling factor in *Manoa Finance*—compensation for comparable nonbankruptcy services—is unchanged in new § 330(a).

Curiously, the law firm does not mention *Manoa Finance* (or § 330(a)(3)). Instead, it invokes the obsolete laundry list from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The items on that laundry list, however, are now subsumed within more refined analyses. To the extent that the silent treatment is an argument that *Manoa Finance* does not apply, we reject the argument as contrary to controlling authority.

## B

The burden, then, was on the law firm to show that its standard hourly rates were unreasonably low and that comparable nonbankruptcy services would have yielded a higher fee.

### 1

■ The law firm did not come forward with specific evidence showing why $126,060 in standard hourly fees was not reasonable compensation for the $700,000 settlement.

The primary evidence proffered was that the settlement produced a so-called "surplus" estate. The implied argument is that the *Manoa Finance* standard becomes more flexible because the debtors are realizing a windfall. This crams too much content into the concept of surplus by equating it with a windfall as if it were a benefit one has no right to expect.

The colloquialism "surplus" in connection with 11 U.S.C. § 726(a) is, as this case illustrates, a misnomer. What is meant is that there is something to distribute to the bottom tier of the bankruptcy distribution scheme after payment of priority claims and expenses, timely and untimely claims, fines and penalties, and interest on all of these items. The bottom tier is the debtor. 11 U.S.C. § 726(a)(6).

■ The salient point is that debtors, like creditors, are legitimate beneficiaries of the estate. A distribution to debtors under § 726(a)(6) is no more a windfall than a distribution to unsecured creditors under § 726(a)(2)—the economic realities of bankruptcy just make it less common.

Here, the debtors lost about $1.3 million in the debacle that precipitated the bankruptcy. Measured against those losses, the distribution of $400,000 to the debtors is no windfall.

The existence of a surplus estate, it follows, does not relax the application of the *Manoa Finance* test. It applies in the same manner regardless of whether the marginal distributees (in the economist's sense of the term) are creditors or debtors.

### 2

Nor did the law firm come forward with specific evidence that a bonus is necessary to make the fee award commensurate with compensation for comparable nonbankruptcy services.

A nonbankruptcy lawyer who contracted to litigate for hourly rates without discount or other bargained-for condition, would be hard put to demand more than what has been promised.

Although the law firm did craftsmanlike work, it did not prove that the client got more than the benefit of its bargain.

### C

The bankruptcy court was also required to make detailed findings to justify a bonus. *Manoa Finance*, 853 F.2d at 692.

The court's findings were not sufficiently detailed to support the bonus fee award. Rather, the findings that the firm's efforts produced a "fine" result but not a "stupendous, wonderful" result are fatal to the bonus.

■ Under the governing *Manoa Finance* test, a mere "fine" result is not sufficient to support the award of a bonus.

### II

■ The debtors contend that judicial estoppel, which is also known as the doctrine of preclusion of inconsistent positions, precludes the law firm from requesting a bonus. We agree.

The law firm first gained advantage by touting the fact that it had chosen to work for hourly fees rather than higher contingent fees as a basis to persuade the court to approve the $700,000 settlement as fair and equitable. It also gained the debtors' support for the settlement by representing that they would receive about $400,000, a sum that squared with hourly fees. The unmistakable implication is that the law firm would be content with hourly compensation that was materially less than the contingent fee the debtors had originally proposed.

Then it gained a second advantage by taking the incompatible position that its $126,060 fee should be elevated by $50,000

to a sum greater than the contingent fee originally proposed, with the debtors' distribution correlatively reduced to about $350,000.

■ A court has discretion to invoke judicial estoppel against one who plays "fast and loose" so as to gain advantage by taking one position and then seeks to gain a second advantage by taking an incompatible position. *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir.1996); *Henrichsen v. Scovis (In re Scovis)*, 231 B.R. 336, 342 (9th Cir. BAP 1999).

The case for imposing judicial estoppel in this instance is sufficiently strong to warrant the conclusion that the bankruptcy court abused its discretion by rejecting the debtors' request.

Hence, the law firm is estopped from seeking a bonus even if it could otherwise be justified.

### Conclusion

The trustee's law firm did not proffer specific evidence that compensation at its full hourly rates was not reasonable in light of results obtained and did not show that a bonus is necessary to make the award commensurate with compensation for comparable nonbankruptcy services. The bankruptcy court applied an incorrect legal standard and did not make detailed findings supporting the award of a bonus. Finally, judicial estoppel precludes the award of a bonus for services as special counsel.

The award of a bonus is REVERSED.